T.C. Memo. 1997-472


UNITED STATES TAX COURT


ROY G. AND DOROTHY M. WELKER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15080-92.                    Filed October 15, 1997.


<u>George E. Marifan</u> and <u>Iris Miranda-Kirschner</u>, for
petitioners.

<u>Michael W. Bitner</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in, and
additions to, petitioners' Federal income tax as follows:

| | | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653 (b)(1) | Sec. 6653 (b)(1)(A) | Sec. 6653 (b)(1)(B) | Sec. 6653 (b)(2) | Sec. 6661 (a) |
| 1984 | $814 | $2,745 | -- | -- | 50% of the interest due on $5,211 | $1,372 |
| 1985 | 816 | 5,888 | -- | -- | 50% of the interest due on $11,215 | 2,944 |
| 1986 | 757 | -- | $9,662 | 50% of the interest due on $12,865 | -- | 3,221 |
| 1987 | 2,145 | -- | 6,779 | 50% of the interest due on $8,997 | -- | 2,260 |

Respondent determined the additions to tax for fraud only against petitioner Roy G. Welker (Mr. Welker).

After concessions, the issues for decision are: (1) Whether Mr. Welker is liable for additions to tax for fraud for 1984, 1985, 1986, and 1987; and (2) whether petitioners are liable for additions to tax for a substantial understatement for 1984, 1985, 1986, and 1987. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

                              FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Belleville, Illinois, at the time they filed their petition.

Mr. Welker, who had a high school education, prepared petitioners' tax returns for each of the years in issue.[1]

Mr. Welker worked at Miller-Senate Finance Co. (Miller-Senate) as the office manager/loan officer. As such, he ran the day-to-day operations of Miller-Senate. His duties included: (1) Approval of vehicle loans; (2) preparation of documents relating to such loans; (3) arrangement of credit lines; and (4) collection and repossession activities.

Virtually all of the loans Mr. Welker approved on behalf of Miller-Senate were loans for cars purchased from Bob Brockland Pontiac-GMC (Brockland Pontiac). Brockland Pontiac utilized Miller-Senate for the financing of new and used cars sold to high risk customers.[2] Miller-Senate obtained these high risk loans (the high risk loans) by purchasing chattel mortgage contracts from Brockland Pontiac. Miller-Senate lost approximately $300,000 on these loans.

Mr. Welker and Brockland Pontiac had an arrangement whereby Brockland Pontiac made payments to Mr. Welker in the amount of $100 in cash for each high risk loan Mr. Welker purchased on

---

[1] Unless otherwise indicated, all descriptions refer to the 1984, 1985, 1986, and 1987 tax years.

[2] High risk customers were those who could not qualify for conventional financing through banks and dealer financing.

behalf of Miller-Senate (the cash payment).[3]  The cash payments were placed in envelopes with the name "Welker" on them, and Mr. Welker received them when he arrived at Brockland Pontiac to pick up the papers for the high risk loans.

Mr. Welker never thanked Bob Brockland for any of the cash payments, and Mr. Welker never was surprised that he received $100 in cash for each loan he approved.  Bob Brockland did not consider the cash payments to Mr. Welker to be gifts from Brockland Pontiac; instead, he thought they were fees which were a cost of doing business.

Mr. Welker received the following amounts from Brockland Pontiac as a result of his purchase of high risk loans on behalf of Miller-Senate:[4]

| Year | Amount |
| --- | --- |
| 1984 | $14,209 |
| 1985 | 29,400 |
| 1986 | 31,697 |
| 1987 | 21,900 |

Mr. Welker did not keep any records of the cash payments he received from Brockland Pontiac.

---

[3]  We note that some of the first few payments were $50 in cash rather than $100.  We use $100 as the amount of the cash payment throughout the opinion for convenience only.

[4]  Neither party explained why the total for 1984 or 1986 is not divisible by 50 or 100.

Richard Breslin (Mr. Breslin), a C.P.A., was the accountant for Miller-Senate. Mr. Breslin and Mr. Welker regularly went to lunch each month after Mr. Breslin reviewed Miller-Senate's records. At these lunches, Mr. Welker occasionally asked Mr. Breslin questions about tax return preparation. Mr. Breslin remembered questions regarding how to handle a dividend exclusion, report a gain on the sale of stock, and report income that was not evidenced by a Form 1099. Mr. Breslin did not remember having any conversations with Mr. Welker regarding the tax treatment of gifts.

Brockland Pontiac did not issue any Forms 1099 to Mr. Welker for the cash payments; however, Mr. Welker was aware that he had to report all his income on his tax return regardless of whether he received a Form 1099. Mr. Welker did not report the cash payments as income for the years in issue.

On March 29, 1989, Special Agent Debra K. Alexander (Ms. Alexander) and Revenue Agent Timothy E. Neighbors (Mr. Neighbors) interviewed Mr. Welker at his home. Ms. Alexander read Mr. Welker his rights and informed him that he was under criminal investigation for unreported income he received from Brockland Pontiac. Mr. Welker stated that, for the years in issue, he reported all of his income on his tax returns. Mr. Welker also told Ms. Alexander and Mr. Neighbors that he did not receive any

other income or any gifts during the years in issue. During the interview, Ms. Alexander specifically asked Mr. Welker about the cash payments Mr. Welker received from Brockland Pontiac from 1984 through 1987; however, Mr. Welker told Ms. Alexander that he did not want to comment on this matter.

On March 30, 1989, Ms. Alexander and Mr. Neighbors met with Mr. Welker. Again, Mr. Welker told Ms. Alexander that he did not want to discuss the cash payments he received from Brockland Pontiac.

It was not until June 9, 1989, that Mr. Welker was willing to discuss the cash payments. Mr. Welker admitted that he did receive cash payments from Brockland Pontiac. Mr. Welker, however, claimed that the cash payments were gifts.

In United States v. Roy G. Welker, Criminal No. 90-30042-WLB (S.D. Ill. Dec. 14, 1990), Mr. Welker was charged with willfully filing false income tax returns for 1984 and 1986 in violation of section 7206(1) (the criminal tax case). During the criminal tax case, in addition to filing amended tax returns for the years in issue and reporting the cash payments from Brockland Pontiac as income, Mr. Welker filed a document entitled "Defendant's Version of the Offense" with the District Court. In this document, Mr. Welker admitted that when he prepared his income tax returns for the years in issue he knew that he should have reported the cash

payments from Brockland Pontiac as income.  Mr. Welker also admitted that he did not believe that his tax returns for the years in issue, as well as 1983, were true and correct as to every material matter.  On December 14, 1990, as a result of Mr. Welker's plea of guilty in the criminal tax case, the United States District Court for the Southern District of Illinois found Mr. Welker guilty of violating section 7206(1) for 1984 and 1986.

OPINION

Addition to Tax for Fraud

The addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938).  Fraud is intentional wrongdoing on the part of the taxpayer with the specific purpose to evade a tax believed to be owing.  McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

The Commissioner has the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  To satisfy the burden of proof, the Commissioner must show:  (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or

otherwise prevent the collection of taxes. See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). The Commissioner must meet this burden through affirmative evidence because fraud is never imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970).

### A.    Underpayment of Tax

Petitioners admitted in their amended returns that they had underreported, in their original returns, cash payments from Brockland Pontiac for each year in issue. The filing of those amended returns is an admission of an underpayment of tax for each of those years. See Badaracco v. Commissioner, 464 U.S. 386, 399 (1984).

### B.    Fraudulent Intent

The Commissioner must prove that a portion of such underpayment for each taxable year was due to fraud. Professional Servs. v. Commissioner, 79 T.C. 888, 930 (1982). The existence of fraud is a question of fact to be resolved from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v.

Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). A taxpayer's entire course of conduct can be indicative of fraud. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). The sophistication, education, and intelligence of the taxpayer are relevant to determining fraudulent intent. See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Stephenson v. Commissioner, supra at 1006; Iley v. Commissioner, 19 T.C. 631, 635 (1952).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. These badges of fraud include: (1) Understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash. See Spies v. United States, supra at 499; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although no single factor is necessarily

sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence.  Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.  We note that some conduct and evidence can be classified under more than one factor.

### 1.    Mr. Welker's Sophistication and Experience

Mr. Welker was an office manager/loan officer for a finance company.  He had a high school education and no formal training in tax return preparation or accounting.  Mr. Welker, however, knew to deduct Social Security and withholding taxes from the amounts he paid himself from Miller-Senate.  Additionally, he informally asked Miller-Senate's accountant some questions about tax return preparation.

### 2.    Consistent and Substantial Understatements of Income

The mere failure to report income is not sufficient to establish fraud.  Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172.  Consistent and substantial understatement of income, however, may be strong evidence of fraud when coupled with other circumstances.  Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980).  A pattern of consistent underreporting of income, when accompanied by other circumstances indicating an intent to conceal income, may justify the inference

of fraud.  Holland v. United States, 348 U.S. 121, 139 (1954).

Mr. Welker concedes that he consistently underreported income.

Taking into account the record as a whole, this is evidence of

fraud.

3.    Failure To Maintain Adequate Books and Records

Failure to maintain adequate books and records may be

indicative of fraud.  Truesdell v. Commissioner, 89 T.C. 1280,

1302 (1987); Gajewski v. Commissioner, supra at 200.  Mr. Welker

did not keep any records regarding the cash payments he received

from Brockland Pontiac.  This is evidence of fraud.

4.    Intent To Mislead

Misleading statements to an investigating agent may be

evidence of fraud.  See Gajewski v. Commissioner, supra at 200.

Mr. Welker argues that, from the very beginning, he always

believed that the cash payments from Brockland Pontiac were

gifts, and he so informed Ms. Alexander and Mr. Neighbors on June

9, 1989.  In his first interview with Ms. Alexander and Mr.

Neighbors on March 29, 1989, however, Mr. Welker stated that he

did not receive any gifts during the years in issue.

Additionally, as part of the criminal tax case, Mr. Welker

admitted that when he prepared his income tax returns for the

years in issue he knew that he should have reported the cash

payments from Brockland Pontiac as income.

If Mr. Welker had truly believed that the cash payments were

gifts, he misled Ms. Alexander and Mr. Neighbors on March 29,

1989, when he told them he had received no gifts.  Since Mr. Welker knew that he should have reported the cash payments from Brockland Pontiac as income when he prepared his returns, he misled Ms. Alexander and Mr. Neighbors on June 9, 1989, when he told them that the cash payments were gifts.  All of this is evidence of fraud.

### 5.   Lack of Credibility of Mr. Welker's Testimony

A taxpayer's lack of credibility, inconsistent testimony, or evasiveness are factors in considering the fraud issue. Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25.

Mr. Welker claims that he asked Mr. Breslin about who pays the tax on gifts.  It is questionable, however, whether Mr. Welker ever discussed the tax treatment of gifts with Mr. Breslin.  Mr. Breslin had no recollection of such a conversation; however, he specifically remembered discussing how to handle a dividend exclusion, report a gain on the sale of stock, and report income that was not evidenced by a Form 1099 with Mr. Welker.[5]

At trial, Mr. Welker claimed that he originally told Ms. Alexander that he did not receive any gifts because he didn't want to get Bob Brockland in trouble.  Mr. Welker could not

---

[5]  Even if Mr. Welker and Mr. Breslin had this discussion, Mr. Welker never informed Mr. Breslin about the circumstances surrounding the receipt of the cash payments from Brockland Pontiac.

explain how this information would have gotten Bob Brockland in trouble. Furthermore, Bob Brockland did not consider the cash payments to Mr. Welker to be gifts from Brockland Pontiac; instead, he thought they were fees which were a cost of doing business.

Mr. Welker also implied that he did not need to be wholly forthright or honest in his meetings with the agents because he "wasn't on a stand or on trial."

Additionally, a conviction under section 7206(1) may render a taxpayer's credibility suspect. See Piazza v. Commissioner, T.C. Memo. 1985-222; see also Fed. R. Evid. 609(a). Mr. Welker pleaded guilty to, and was found guilty of, willfully filing false income tax returns in violation of section 7206(1) for 1984 and 1986.

All these facts, when taken together, are evidence of fraud.

6. Filing False Documents (The Criminal Tax Conviction)

Although not dispositive, Mr. Welker's convictions under section 7206(1) are probative evidence that he intended to evade taxes. See Wright v. Commissioner, 84 T.C. 636, 643-644 (1985).

7. Dealing in Cash

The exclusive use of cash when conducting business transactions, when coupled with a lack of recordkeeping, is evidence of fraud. McGirl v. Commissioner, T.C. Memo. 1996-313; see also Nicholas v. Commissioner, 70 T.C. 1057, 1066 (1978) (dealing extensively in cash increases the relevance of

inadequate recordkeeping in determining fraudulent intent). Mr. Welker exclusively received cash payments from Brockland Pontiac and kept no records of the payments. This is evidence of fraud.

C.   Conclusion

After reviewing all of the facts and circumstances, we conclude that respondent has clearly and convincingly proven that the underpayment of tax for each of the years in issue was due to fraud on the part of Mr. Welker. Therefore, we sustain respondent's determination that Mr. Welker is liable for additions to tax for fraud pursuant to section 6653(b)(1) and (b)(2) for 1984 and 1985, and section 6653(b)(1)(A) and (b)(1)(B) for 1986 and 1987.

Addition to Tax for a Substantial Understatement

On brief, petitioners argue that respondent committed an abuse of discretion by failing to waive the addition to tax for a substantial understatement because Mr. Welker provided a reasonable explanation for the understatement and held a good faith, but mistaken, belief that the cash payments were gifts. Respondent argues that there was no abuse of discretion in failing to waive the addition to tax because no reasonable cause exists.

Petitioners failed to establish at trial that there was reasonable cause for treating the cash payments as gifts or that Mr. Welker believed in good faith that they were gifts. To the contrary, in his criminal case he admitted that when he filed his

tax returns he knew that the cash payments should have been reported as income.  Accordingly, the additions to tax for a substantial understatement are sustained.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.